UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BALANCE AUTHORITY LLC, an Indiana limited liability company; SOLAR INTEGRATED ROOFING CORP., a Nevada corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>CORINNE HEPLER, Personal Representative of the Estate of Eric L. Hepler; U.S. HOME SUPPLEMENTS, LLC, a Maryland limited liability company; CHAD FREEHAUF, an individual; EMILY KEEN, an individual; JOHANNA NORTON AKA JOHANNA FREEHAUF, an individual; DOES I through X, inclusive; and ROE CORPORATIONS I through X, inclusive,<br><br>Defendants. | CASE NO.:1-22-cv-00327 |

## CIVIL COMPLAINT AND JURY DEMAND

Plaintiffs Balance Authority LLC ("Balance") and Solar Integrated Roofing Corp. ("SIRC") (Balance and SIRC, collectively, the "Plaintiffs"), by and through their attorneys of record, the law firm of Marquis Aurbach, allege and complain as follows:

## PARTIES

1. Balance is and was at all times relevant herein, an Indiana limited liability company, organized under the laws of the State of Indiana, conducting business as "Balance," "Balance Claims" and "Balance Claims LLC."

2. SIRC is and was at all times relevant herein, a Nevada corporation, organized under the laws of the State of Nevada, conducting business in Clark County, Nevada. Balance is a subsidiary of SIRC.

3. Corinne Hepler ("Mrs. Hepler") is and was at all times relevant herein the Personal Representative of the Estate of Eric L. Hepler (collectively, "Estate of Eric Hepler" or "Hepler"), currently subject to probate in Hamilton County, Indiana (Cause No. 29D03-2204-EU-000208).

4. U.S. Home Supplements, LLC ("US Home Supplements") is and was at all times relevant herein, a Maryland limited liability company, conducting business in Indiana.

5. Chad Freehauf ("Freehauf") is and was at all times relevant herein, an individual residing and working in the state of Indiana.

6. Emily Keen ("Keen") is an was at all times relevant herein, an individual residing and working in the state of Indiana.

7. Johanna Norton aka Johanna Freehauf ("Norton") is and was at all times relevant herein, an individual residing and working in the state of Indiana. (Estate of Eric Hepler, US Home Supplements, Freehauf, Keen and Norton, collectively, the "Defendants").

8. The names and capacities, whether individuals, corporate, associate or otherwise of Defendants named herein as DOE and ROE CORPORATION are unknown or not yet confirmed. Upon information and belief, said DOE and ROE CORPORATION Defendants are responsible for damages suffered by Plaintiffs and, therefore, Plaintiffs sue said Defendants by such fictitious names. Plaintiffs will ask leave to amend this Complaint to show the true names and capacities of each DOE and ROE CORPORATION Defendant at such time as the same has been ascertained.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 because Plaintiffs allege a federal law claim over which this Court has original jurisdiction, and all other claims are so related to the claim within such original jurisdiction that they form part of the same case or controversy within Article III of the United States Constitution.

10. This Court has personal jurisdiction over US Home Supplements because (1) its business activities and contacts in Indiana have been, and continue to be, so substantial, continuous, and systematic that US Home Supplements is deemed present in the forum; and (2) the obligations, acts and omissions complained of in this Complaint were felt, incurred, and committed, in whole or in part, in Indiana, and thus US Home Supplements has had sufficient minimum contacts with this forum such that the exercise of personal jurisdiction over them will not offend traditional notions of fair play and substantial justice.

11. This Court has personal jurisdiction over Freehauf, Keen and Norton because they are residents of Indiana, and are thus "at home" in Indiana. Moreover, this Court has personal

jurisdiction over Freehauf, Keen and Norton because this case arises out of their contacts with Indiana, which were directed to and felt, incurred and committed, in whole or in part, in Indiana.

12. This Court has personal jurisdiction over Mrs. Hepler (and the Estate of Eric Hepler) because she serves as the personal representative for Hepler's estate currently subject to probate in Indiana. Moreover, this case arises out of the decedent's (Hepler) contacts with Indiana, which were directed to and felt, incurred and committed, in whole or in part, in Indiana.

13. This Court is a proper venue for this action under 28 U.S.C. § 1391(b)-(c).

## GENERAL ALLEGATIONS

14. Balance is a claims administration company based in Indiana that specializes in assisting roofing and solar contractors navigate the insurance claims process.

15. Balance offers a variety of services to its clients, which include, but are not necessarily limited to, consulting services, estimate writing, supplemental administration, and training.

16. With respect to estimate writing, Balance provides its clients with a proprietary solution that takes advantage of specialized software programs.

17. SIRC is a solar power company specializing in commercial and residential applications throughout the United States. SIRC, and its family of subsidiaries, serve various sectors within the solar industry.

**2019 BALANCE OPERATING AGREEMENT & HEPLER'S NON-COMPETE PROVISION**

18. Balance's operating agreement ("Operating Agreement") was originally entered into on or around September 3, 2015, and was later amended on or around November 11, 2019.

19. Balance's original members and signatories to the Operating Agreement were Troy Clymer, Eric Hepler, Josh Roseboom, Zech Manring and John Dye (each a "Balance Member", and collectively the "Balance Members").

20. Upon information and belief, Hepler served as Chief Executive Officer (CEO) of Balance from approximately September 2015 to April 2021.

21. The Operating Agreement set forth a variety of provisions that restricted the Balance Members in certain ways, including but not limited to the following:

      a.    Section 11.1 (Confidentiality) – "Each Member shall not disclose any Confidential Information for any purpose other than the conducting the Company's business or internal matters."

      b.    Section 11.4 (Duty Not to Compete) – "No Member, while a Member of the Company, shall engage in any business activities, directly or indirectly, that [compete] with any business in which the Company is engaged, except with the consent of the Majority-in-Interest of the Members."

      c.    Section 11.5 (Covenant Not to Compete) – "Member shall not create a competing business within one (1) year of leaving the Company but may engage in a sole proprietorship or employment through another business not related to the Company without violating this Agreement."

## 2021 SIRC-BALANCE MERGER AGREEMENT

22.    SIRC and Balance executed an Agreement and Plan of Merger dated April 28, 2021 (the "Merger Agreement").

23.    As part of the Merger Agreement, Balance merged with a SIRC "merger sub." (the "Merger").

24.    Following Balance's merger with the SIRC merger sub, Balance continued to operate as a subsidiary of SIRC.

25.    The Merger Agreement identified each of the Balance Members, including Hepler, as "Target Shareholders."

26.    In exchange for Balance merging with the SIRC merger sub and subsequently becoming a subsidiary of SIRC, the Target Shareholders collectively received the following compensation pursuant to the Merger Agreement:

      a.    $1.5 million in cash;

      b.    10 million SIRC shares;

      c.    2 million SIRC shares held in escrow, to later vest as 1 million SIRC shares or $600,000 cash depending on the election of the Target Shareholders.

27. As per Exhibit A to the Merger Agreement, Hepler received $470,000 of the collective $1.5 million cash compensation, and 3,133,333 of the 10 million SIRC shares.

   a. Hepler also received an additional $188,000 in cash compensation at a later point in time pursuant to the Merger Agreement, for a total cash compensation of $658,000.

28. The Merger Agreement set forth the following provisions:

   a. Section 2.06 (Effects of the Merger) – "…all property, rights, privileges, immunities, powers, franchises, licenses and authority of the Target and Merger Sub shall vest in the Surviving Corporation…"

   b. Section 5.01 (Conduct of Business Prior to Closing) – "…the Target shall… use reasonable best efforts to maintain and preserve intact the current organization, business and franchise of the Target and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having business relationships with the Target."

29. A major benefit to SIRC of the Merger Agreement was the acquisition of Balance's intellectual property. Indeed, Sections 3.06(i)-(j) of the Merger Agreement ensured that the intellectual property belonging to Balance and being acquired by SIRC ("Balance Intellectual Property") had remained intact and had not been assigned prior to the execution of the Merger Agreement.

   a. The Merger Agreement defined intellectual property to include the following:

   > "… trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and property information and all rights therein…"

30. Upon information and belief, Hepler departed from Balance around the same time that SIRC acquired Balance via the Merger Agreement in April 2021.

**KEEN, FREEHAUF AND NORTON'S NON-COMPETE AND CONFIDENTIALITY PROVISIONS**

31. Keen signed an employment agreement with Balance on or around January 28, 2019. In conjunction with said employment agreement, Keen signed a Non-Disclosure, Non-Solicitation &

Confidentiality Agreement dated February 4, 2019 ("Keen Agreement"). The Keen Agreement set forth the following:

> a. Section 1 of the Keen Agreement ("Disclosure of Confidential Information") set forth the following:
>
>> W2-Supplementor specifically acknowledges that Confidential Information derives independent economic value from not being readily known to or ascertainable by proper means by others; that reasonable efforts have been made to maintain the secrecy of such information; and that such information is the sole property of BALANCE. W2-Supplementor agrees not to use the Confidential Information in any way directly or indirectly detrimental to BALANCE. In particular, W2-Supplementor agrees that he will not, as a result of knowledge or information obtained from the Confidential Information or otherwise in connection with a possible business arrangement, divert or attempt to divert any business or customer of BALANCE. W2-Supplementor agrees to keep completely and unconditionally confidential the names of any institutions, corporations, investors, organizations, individuals or groups of individuals introduced by either of the parties or their associates. Further, W2-Supplementor agrees that he will not make any direct or indirect contact with any business institution, investor(s), individual(s), and or other such individuals referenced or introduced by BALANCE, without the express, written consent of BALANCE. Nothing in this Agreement shall be understood as having granted, expressly or by implication, any rights to proprietary or confidential information, trade secrets or know-how of the other party.
>
> b. The Keen Agreement defines Confidential Information as set forth below:
>
>> [A]ll information, whether reduced to writing, maintained on any form of electronic media, or maintained in mind or memory and whether compiled by W2-Supplementor or others, that contains or otherwise reflects information exchanged. Confidential Information shall also include all proprietary software and related documentation, as well as all reports, analyses, notes or other information that are based on, contain or reflect any Confidential Information and information belonging to third party partners and vendors.
>
> c. Section 6 of the Keen Agreement ("Noncompetition/Nonsolicitation") set forth the following:
>
>> W2-Supplementor agrees not to divert or attempt to divert BALANCE's business customers or prospects based on information gained from or during his Relationship with BALANCE, including introductions made by BALANCE. Without prior written consent, for a period of 12 months from his termination date, W2-Supplementor will not solicit, offer to hire, or hire any BALANCE officers or W2-Supplementors.

32. Keen left Balance on or round August 8, 2021.

33. Norton worked as a Balance employee as early as March 2021, having signed a payroll addendum with Balance on or around March 26, 2021.

34. Norton left Balance on or around July 13, 2021, and executed a Resignation [A]cceptance & General Release – Separation Agreement that was delivered to Balance on or around July 12, 2021 ("Norton Agreement")

    a. Section 7 of the Norton Agreement ("Confidential Information; Return of Property") set forth the following:

> The Employee acknowledges that during the course of the Employee's employment with the Company, the Employee has been entrusted with certain personal, legal, business, financial, technical, and other proprietary information and materials that are the property of the Company and that involve confidential vendors, employees, agents, and patrons. The protection of confidential business information is vital to the interests and success of the Company. Therefore, the Employee agrees and promises that the Employee will not communicate or disclose to any third party, or use for the Employee's own benefit, without the prior written consent of the Company, any of the above-mentioned information or material, except as required by law, unless and until such information or material becomes generally available to the public through no fault of the Employee. In the event the disclosure of such information is required by law, the Employee agrees that the Employee will give immediate written notice to the Company as to enable it to seek an appropriate protective order.

    b. Section 9 of the Norton Agreement ("Non-Competition and Non-Solicitation") set forth the following:

> The Employee acknowledges and recognizes the highly competitive nature of the businesses of the Company and its affiliates and accordingly agrees that for a period of 12 months following the Separation Date (the "Restricted Period"), the Employee will not, whether on the Employee's own behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("Person"), directly or indirectly engage in any business that directly and indirectly competes in any material way with the primary business of the Company in any city in which the Company has a branch or administrative office."

35. Freehauf joined Balance as an employee on or around November 26, 2020.

36. Freehauf left Balance on or around July 13, 2021, and executed a Resignation accepted & General Release – Separation Agreement that was delivered to Balance on or around July 12, 2021 ("Freehauf Agreement")

37. The Freehauf Agreement had the same provisions regarding confidentiality (Section 7) and non-competition (Section 9) as the Norton Agreement.

**HEPLER VIOLATES HIS NON-COMPETE & CONFIDENTIALITY PROVISIONS AND COLLUDES WITH US HOME SUPPLEMENTS TO CREATE A COMPETING BUSINESS**

38. As set forth above, Hepler, as a member of Balance and signatory to the Operating Agreement, agreed to not create a competing business within one (1) year of separating from Balance.

39. Upon information and belief, Hepler separated from Balance on or around April 2021.

40. Following his departure from Balance, but within a year of said departure, Hepler began working with US Home Supplements, which was formed approximately three (3) years ago in October 2019.

41. Upon information and belief, Hepler proceeded to solicit no less than three (3) Balance employees to leave Balance and join US Home Supplements. These employees include but are not necessarily limited to Keen, Freehauf and Norton. Upon information and belief, Hepler also contacted other Balance employees in an attempt to get them to leave Balance and work for him and US Home Supplements.

42. Additionally, upon information and belief, Hepler misappropriated no less than four (4) major customers of Balance with the assistance of Keen, Freehauf and/or Norton, who subsequently became customers of US Home Supplements.

43. By recruiting Balance employees and soliciting its customers to switch to US Home Supplements for its claims administration needs, Hepler helped create a direct competitor to Balance – in contravention of Section 11.5 of the Operating Agreement.

44. Furthermore, Hepler disclosed confidential information to US Home Supplements through the misappropriation of confidential customer information/lists belonging to Balance, as well as proprietary methods and strategies belonging to Balance – in contravention of Section 11.1 of the Operating Agreement.

45. Hepler even sought to co-opt Balance's customer relationship management (CRM) and marketing strategies through soliciting information from Balance's providers for the same (and

contacting Balance executives/employees who dealt with the same). In short, Hepler sought to re-create Balance's CRM and marketing strategies for US Home Supplements.

46. Concurrent with his efforts in support of US Home Supplements, Hepler received an ownership interest in US Home Supplements.

47. Upon information and belief, US Home Supplements was aware of the existence of client and contractual relationships that belonged to Balance (and thus SIRC). US Home Supplements was further aware that Hepler, with whom they collaborated with in furtherance of building a claims administration business in Indiana, was a prior principal of Balance. Notwithstanding the foregoing, US Home Supplements actively sought out and knowingly received the benefits of Hepler's prior affiliation with Balance.

**KEEN, FREEHAUF AND NORTON VIOLATE THEIR NON-COMPETE AND CONFIDENTIALITY PROVISIONS**

48. As employees of Balance, Keen, Freehauf and Norton worked closely with Balance's clients on a variety of insurance claims administration needs throughout the state of Indiana (the "Balance Clients").

49. Keen, Freehauf and Norton all proceeded to leave Balance and join US Home Supplements in 2021.

50. After Keen, Freehauf and Norton joined US Home Supplements, Balance began to experience a considerable decline and/or decreased growth in sales among several of its major clients.

   a. For one of the major Balance Clients, Balance grew its sales exponentially from 2019 to 2020, but suddenly experienced a rapid decline in sales for 2021.

   b. For another of the major Balance Clients, Balance consistently grew its sales from 2018-2020 at an exponential rate. Yet for 2021, said sales growth halted abruptly.

51. The departure of Keen, Freehauf and Norton (and Hepler) to US Home Supplements in 2021, and Balance's subsequently declining/slowing sales for 2021 among the major Balance Clients, are far from coincidence.

    a. For example, with respect to one of the major Balance Clients (in particular a client in which Balance experienced significantly declining sales growth for in 2021), Balance eventually came in possession of an estimate for said client that was drafted by US Home Supplements – in the same exact proprietary manner as Balance drafted its estimates for its clients, even down to the same legal disclaimer.

      i. Balance seemingly received this estimate in error from this particular client, who subsequently cut off Balance's access to its customer relationship management software following the erroneous transmission.

      ii. With respect to insurance claims administration, the form, structure and calculation of estimates are a critical aspect of the business, and a key way in which industry participants such as Balance solicit and retain its clients.

 52. Keen, Freehauf and Norton's solicitation of the Balance Clients, their subsequent work for US Home Supplements, a direct competitor to Balance, and their use of proprietary forms and methods belonging to Balance, contravenes the confidentiality and non-compete provisions set forth in the agreements they signed, as set forth above.

 53. Upon information and belief, US Home Supplements was aware of the existence of client and contractual relationships that belonged to Balance (and thus SIRC). US Home Supplements was further aware that Keen, Freehauf and Norton, with whom they collaborated with in furtherance of building a claims administration business in Indiana, were prior employees of Balance. Notwithstanding the foregoing, US Home Supplements actively sought out and received the benefits of Keen, Freehauf and Norton's prior employment with Balance (and also rewarded Keen, Freehauf and Norton).

## **FIRST CLAIM FOR RELIEF**

**(Breach of Contract – Against Estate of Eric Helper, Freehauf, Keen, Norton)**

 54. Plaintiffs repeat and reallege the preceding paragraphs as though fully stated herein.

 55. Hepler entered into a valid and enforceable contract in the form of the Operating Agreement.

56. The Operating Agreement forbid members of Balance such as Hepler from disclosing confidential information about Balance's business as well as creating a competing business within one year of separation from Balance.

57. By joining US Home Supplements and helping the company build a competing business to Balance within a year of leaving Balance, Hepler materially breached the Operating Agreement.

58. Furthermore, by disclosing confidential information belonging to Balance, namely customer lists and proprietary methods regarding claims estimation, Hepler further breached the Operating Agreement's confidentiality provision.

59. The Keen Agreement, Freehauf Agreement and Norton Agreements are valid and enforceable contracts against Keen, Freehauf and Norton respectively.

60. By diverting Balance's customers, using Balance's proprietary claims estimation methods, and working for a direct competitor in US Home Supplements within a year of departing Balance, Keen, Freehauf, and Norton materially breached the Keen Agreement, Freehauf Agreement, and Norton Agreement, respectively.

61. Balance and SIRC have performed all of the conditions, covenants, and promises that the Operating Agreement, Keen Agreement, Freehauf Agreement, and Norton Agreement required of them, except as waived or excused by Hepler, Keen, Freehauf, and Norton's breaches of the same.

62. As a direct and proximate result of the aforementioned breaches, Balance and its parent company SIRC have been damaged and continues to suffer damages in an amount to be proven at trial.

63. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned breaches of contract.

## SECOND CLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against Estate of Eric Hepler, Freehauf, Keen, Norton)**

64. Plaintiffs repeat and reallege the preceding paragraphs as though fully stated herein.

65. The Operating Agreement, Keen Agreement, Freehauf Agreement and Norton Agreement each contained an implied covenant of good faith and fair dealing.

66. Hepler, Keen, Freehauf and Norton each had a duty to deal with Balance in good faith.

67. By misappropriating Balance customers and proprietary trade secrets/confidential information, soliciting Balance employees, working for a direct competitor of Balance, and helping create a competing business in the form of US Home Supplements, Hepler, Keen, Freehauf and Norton materially breached the implied covenant of good faith and fair dealing.

68. Upon information and belief, Hepler, Keen, Freehauf and Norton were well aware of their respective obligations set forth in the Operating Agreement, Keen Agreement, Freehauf Agreement and Norton Agreement, yet nonetheless knowingly disregarded said obligations to the detriment of Balance and SIRC.

69. As a direct and proximate result of the aforementioned breaches, Balance and its parent company SIRC have been damaged and continues to suffer damages in an amount to be proven at trial.

70. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned breaches of the implied covenant of good faith and fair dealing.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against Estate of Eric Hepler)

71. Plaintiffs repeat and reallege the preceding paragraphs as though fully stated herein.

72. As a member and CEO of Balance, Hepler, under the express or implied obligations of the Operating Agreement and Merger Agreement, and in whom trust and confidence was placed, owed a fiduciary duty to Balance and SIRC.

73. Hepler breached his fiduciary duties by, among other things, refusing to abide by the terms and conditions of the Operating Agreement, as more fully set forth above.

74. Hepler further breached his fiduciary duties by knowingly working for a direct competitor of Balance, soliciting Balance employees to work US Home Supplements, and misappropriating trade secrets/proprietary information belonging to Balance.

75. As a direct and proximate result of the aforementioned breaches of fiduciary duty, Balance and its parent company SIRC have been damaged and continues to suffer damages in an amount to be proven at trial.

76. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned breaches of fiduciary duty.

### FOURTH CLAIM FOR RELIEF

**(Civil Conspiracy & Tortious Interference with Contractual Relations and Business Relationship/Prospective Economic Advantage – Against All Defendants)**

77. Plaintiffs repeat and reallege the preceding paragraphs as though fully stated herein.

78. As set forth above, Balance and SIRC have a valid contractual and business relationship/prospective economic advantage with respect to (a) the Operating Agreement, Merger Agreement, Keen Agreement, Freehauf Agreement, Norton Agreements (the "Contracts") and (b) their assorted client relationships i.e. the Balance Clients (and the contracts that necessarily flow from said relationships) (the "Client Relationships").

79. Upon information and belief, before working with Hepler (and giving him an ownership interest in US Home Supplements), and before hiring Keen, Freehauf and Norton, US Home Supplements had knowledge of some or all of the Contracts and Client Relationships, as well as Balance and SIRC's contractual and business relationships/prospective economic advantage stemming from the same.

80. Likewise, as a former Balance Member and Target Shareholder, Hepler certainly had knowledge of some or all of the Contracts and Client Relationships, as well as Balance and SIRC's contractual and business relationships/prospective economic advantage stemming from the same.

81. Keen, Norton and Freehauf, as former Balance employees, had knowledge of the Client Relationships, as well as Balance and SIRC's contractual and business relationship/prospective economic advantage stemming from the same.

82. As set forth above, and by intentional and improper interreference, namely the wrongful misappropriation of Balance employees, trade secrets, and clients, Defendants caused a

disruption of the Operating Agreement, Merger Agreement, Keen Agreement, Freehauf Agreement, and Norton Agreement, as well as Balance and SIRC's contractual and business relationships/prospective economic advantage related to the same.

        a. This conduct and underlying tortious interference also constitutes a civil conspiracy under Indiana law. Hepler and US Home Supplements made an agreement to work together to interfere with Balance's business and contractual relationships. Furthermore, Hepler reached similar agreements with Norton, Freehauf and Keen. Balance and SIRC sustained damages, as set forth above, as a result of these civil conspiracies.

83. As a direct and proximate result of the aforementioned intentional interference, Balance and its parent company SIRC have been damaged and continue to suffer damages in an amount to be proven at trial.

84. In addition to any compensatory damages which may be established by the evidence, Balance and SIRC are entitled to punitive damages against Defendants. Defendants knew or should have known, in light of the surrounding circumstances, that its conduct, as set forth above, would naturally and probably result in damages, and was blatantly in violation of the Contracts and Client Relationships, yet nevertheless continued its conduct/interference in reckless disregard of the consequences from which malice may be inferred. In addition, Defendants intentionally pursued a course of conduct for the purpose of causing damages to Balance and its parent company SIRC.

85. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned breaches of fiduciary duty.

## FIFTH CLAIM FOR RELIEF

**(Civil Conspiracy & Violation of Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq. – Against All Defendants)**

86. Plaintiffs repeat and reallege the preceding paragraphs as though fully stated herein.

87. Balance and SIRC are the owner of trade secrets within the meaning of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3) & (4), including but not limited to, the following trade secrets: its customer lists, its proprietary methods/techniques used in creating

estimates/supplements for its clients in conjunction with certain software programs tailored for the task, its customer data/sales strategies, and other trade secrets within the meaning of DTSA. Access to this information would allow a competitor such as US Home Supplements to unfairly compete with Balance and SIRC using Balance and SIRC's own proprietary information, and would provide them with an unfair advantage in attempting to solicit business and train competing employees.

88. At all times relevant herein, Balance and SIRC took all necessary steps to protect against the public disclosure of the aforementioned trade secrets. For example, Balance required its employees, including but not limited to Keen, Freehauf and Norton, to sign confidentiality agreements protecting its trade secrets.

89. Hepler, Keen, Freehauf and Norton, upon leaving Balance and joining US Home Supplements, transferred Balance and SIRC's proprietary information/trade secrets in such a manner that resulted in themselves and US Home Supplements assuming actual possession of said proprietary information/trade secrets.

90. Balance and SIRC are likely to succeed in showing that its proprietary information detailed above, and at all relevant times referenced herein, constitutes a protectable trade secret under the DTSA.

91. Hepler, Keen, Freehauf and Norton's transfer, disclosure, and subsequent use of Balance's customer lists, proprietary customer lists, estimate writing techniques and sales strategies in favor of US Home Supplements, constitutes misappropriation under the DTSA. Moreover, US Home Supplements actively seeking out/soliciting and knowingly receiving actual possession of this information also constitutes misappropriation under the DTSA.

    a. This conduct and underlying misappropriation of trade secrets also constitutes a civil conspiracy under federal law. Hepler and US Home Supplements made an agreement to work together to mimic Balance's success and strategies via the misappropriation of Balance's trade secrets in contravention of DTSA. Furthermore, Hepler reached similar agreements with Norton, Freehauf and Keen. Balance and SIRC sustained damages, as set forth above, as a result of these civil conspiracies.

92. Upon Balance and SIRC's determination of any lost sales or other actual loss by the improper use and misappropriation of its trade secrets by US Home Supplements, Hepler, Keen, Freehauf and Norton, Balance and SIRC are entitled to an award for any such actual loss under 18 U.S.C. § 1836(b)(3)(B).

93. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned misappropriation of its trade secrets.

## SIXTH CLAIM FOR RELIEF

**(Civil Conspiracy & Violation of the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3 et seq. – Against All Defendants)**

94. Plaintiffs repeat and reallege the preceding paragraphs as though fully stated herein.

95. Balance's customer lists, proprietary methods/techniques used in creating estimates for its clients, and its customers data/sales strategies, at all relevant times herein, constitutes a protectable trade secret under the Indiana Uniform Trade Secrets Act ("IUTSA") as set forth in Ind. Code. § 24-2-3-2.

96. At all times relevant herein, Balance and SIRC took all necessary steps to protect against the public disclosure of the aforementioned trade secrets. For example, Balance required its employees, including but not limited to Keen, Freehauf and Norton, to sign confidentiality agreements protecting its trade secrets.

97. Hepler, Keen, Freehauf and Norton, upon leaving Balance and joining US Home Supplements, transferred, disclosed, and/or used Balance and SIRC's proprietary information/trade secrets in such a manner that resulted in themselves and US Home Supplements assuming actual possession of said proprietary information/trade secrets. This aforementioned conduct constitutes misappropriation under Ind. Code. § 24-2-3-2. Likewise, US Home Supplements actively seeking out/soliciting and knowingly receiving actual possession of this information also constitutes misappropriation under the IUTSA.

   a. This conduct and underlying misappropriation of trade secrets also constitutes a civil conspiracy under Indiana law. Hepler and US Home Supplements made an

agreement to work together to mimic Balance's success and strategies via the misappropriation of Balance's trade secrets in contravention of IUTSA. Furthermore, Hepler reached similar agreements with Norton, Freehauf and Keen. Balance and SIRC sustained damages, as set forth above, as a result of these civil conspiracies.

98. Under Ind. Code. § 24-2-3-4, Balance and its parent company SIRC are entitled to a damages award for the actual loss resulting for the wrongful misappropriation of its trade secrets.

99. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned misappropriation of its trade secrets.

## SEVENTH CLAIM FOR RELIEF

**(Unjust Enrichment, in the Alternative to Other Claims for Relief – Against All Defendants)**

100. Plaintiffs repeat and re-allege the preceding paragraphs as though fully stated herein.

101. As described herein, Defendants, and each of them, have received benefits from SIRC and Balance, including but not limited to, cash, stock, intellectual property, proprietary information, benefits, and confidential information.

102. Each of the Defendants appreciated, accepted, or retained those benefits under circumstances, more fully set forth above, such that it would be inequitable for them, and each of them, to retain the benefits without payment for the value thereof.

103. Balance and SIRC have also been forced to retain the services of an attorney to prosecute this matter and is entitled to recover attorney fees and costs incurred by the aforementioned unjust enrichment.

## JURY DEMAND

104. Balance and SIRC respectfully demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief against Defendants:

1. General, special, and consequential damages according to proof;
2. For injunctive and declaratory relief;
3. For an accounting;

4. Restitution;

5. Punitive damages according to proof;

6. Costs of suit incurred herein;

7. For an award of reasonable attorney fees as provided by statute or contact; and

8. For any further relief as the Court deems to be just and proper.

Dated this 23 day of September, 2022.

Respectfully submitted,

By /s/*David E. Miller*
David Miller,
**SAEED & LITTLE LLP**
Indiana Bar No. 31855-32
133 W. Market Street, #189
Indianapolis, IN 46204
Tel; 317-721-9214
David@sllawfirm.com

Chad F. Clement, Esq. (*pro hac application to be filed*)
Nevada Bar No. 12192
Alexander K. Calaway, Esq. (*pro hac application to be filed*)
Nevada Bar No. 15188
Harry L. Arnold, Esq. (*pro hac application to be filed*)
Nevada Bar No. 15866
**MARQUIS AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
Tel: 702-382-0711
cclement@maclaw.com
acalaway@maclaw.com
harnold@maclaw.com

*Attorneys for Plaintiff*